# CHICAGO, ROCK ISLAND & PACIFIC RAILROAD COMPANY

### AND CHARLES KIRK

*v.*

## PAUL HUGHES,

#### A MINOR, BY HIS FATHER AND NEXT FRIEND,

### LEWIS HUGHES

5-5511                                    467 S. W. 2d 150

## Opinion delivered April 26, 1971
[Rehearing denied June 14, 1971.]

*Wright, Lindsey & Jennings;* By: *William R. Overton,* for appellants.

*James C. Cole,* for appellee.

CARLETON HARRIS, Chief Justice. This litigation relates to a railroad crossing accident. On May 24, 1968, a vehicle operated by Thelma Hughes, and in which her brother-in-law, Paul Hughes, appellee herein, was a passenger, was struck by a Chicago, Rock Island & Pacific Railroad Company train at a gravel road crossing in Malvern. Paul Hughes suffered injuries, and subsequently instituted suit against the railroad company and Charles Kirk, and Howard Smith, crewmen,[1] for damages. On trial, the jury returned a verdict for Hughes in the amount of $20,000. From the judgment so entered, appellants bring this appeal. Two points are alleged for reversal, the first being that the trial court erred in submitting to the jury the issue of failure to keep a lookout. It is also asserted that the trial court erred in using modified versions of standard AMI instructions. We proceed to discuss these points in the order listed.

Thelma Hughes testified that she was driving a 1967 Opel Cadet automobile, and that her son Ricky was riding in the front seat with her. Appellee was riding to the right of Ricky. The automobile was a station wagon, having one door on each side, and a lid that lifted up at the back. The back door had a handle on the outside but no handle on the inside. The three were on their way to a little league park, and Mrs. Hughes had crossed at this particular crossing before. She stated that on approaching the crossing, she came to a complete stop about ten feet from the track, heard no whistle blowing or bell ringing, and proceeded to change gears and start up on the track. The motor went dead with the automobile in about the middle of the track, the front wheels being completely over and the back wheels not having crossed the track at all. She attempted to start the car five or six times and then heard "the roar and looked and saw the train coming". She said that it was not traveling very fast and she attempted to start the car again, but without success. She then hollered "jump" and leaped out of the left side of the car, her son following immediately behind her. Paul

---

[1] The court directed a verdict for Smith.

"went over the back seat", but was unable to open the back door since there was no handle on the inside. The train struck the automobile, but was not traveling fast enough to overturn the vehicle, and came to a complete stop within fifty or sixty feet beyond the crossing. Appellee suffered injuries from the collision as heretofore stated.

We think the court erred in submitting the issue of whether the train crew failed to keep a proper lookout. In *Lovegrove* v. *Mo-Pac Railroad Co.*, 245 Ark. 1021, 436 S. W. 2d 798, we held on the question of failure to keep a constant lookout, the railroad company was entitled to a directed verdict if the undisputed testimony of the train crew reflected that such a lookout was being kept; we added that the jury might disregard the crew's testimony when it was inconsistent within itself or contrary to other accepted testimony. In the instant case, we are of the view that not only did the evidence given by the train crew show that a proper lookout was being kept, but also, the other evidence offered, on behalf of appellee, substantiated this fact.

What was the evidence? Charles Graves, classified as a brakeman, testified that he was seated on the front seat on the west side, or left-hand side of the engine. Charles Kirk is an engineer but was classified as a fireman at the time because there had been a reduction in force; however he had served as an engineer in his own right on other runs, and had passed all the requirements as an engineer. He was sitting on the right-hand side of the engine. Howard Smith is an engineer, and at the time, was observing from the left-hand side of the train. As to keeping a lookout, Graves testified:

"Well, we came around the curve and Mr. Kirk was blowing the whistle in this curve and he made a reduction. He set the air brakes and the train slowed down and we, just as we came around the curve, I guess, I don't know approximately how far we were from the crossing, 275 to 300 feet from the Collie Road crossing —we call it the ballpark crossing, I saw this car pull up there. * * * * The car stopped right on the tracks."

He said that the automobile was approximately 15 or 20 feet from the tracks when he observed it and that he pulled the emergency brake valve as soon as the car stopped, this putting "the train in emergency". Graves stated that the train was traveling around fifteen or fourteen miles per hour when he threw it into emergency; that it was moving about four or five miles per hour when it made contact with the car and then traveled about an engine's length past the crossing, or 50 or 60 feet.

Kirk testified that when the car came upon the track, he was able to see the hood and part of the front door, the train traveling around a slight curve. When asked how long it was between the time he saw the door and hood of the car and the time the train went into emergency, Kirk replied "The train was in emergency. The brakeman Graves, had already pulled the emergency valve". He said that he was entirely satisfied with the stop made by the train and it was the best stop that could have been made.

Smith testified that the train was traveling from fifteen to eighteen miles per hour as it approached the crossing; that there is a twenty mile per hour restricted speed at that portion of the track. He said that he first saw the automobile when it drove up to the crossing and stopped, and that the train was between a quarter and a third of a mile away. The witness stated that only a few seconds elapsed from the time the car pulled into view and stopped, and the train was put in emergency. His testimony was that the speed of the train was between two and three miles per hour at the time it struck the automobile.

Thus the testimony by the members of the crew is all to the effect that the automobile was observed as soon as it could have been observed, and the train practically immediately put in emergency. The testimony of Mrs. Hughes is to the same effect. She said that after five or six attempts to start the car, she heard the roar, looked, and saw the train coming; that it was "not very fast". From the record:

"Q. Was the train traveling very fast?

A. Well, when it come around the bend it started braking.

Q. Did you get any impression it was traveling at a fast speed or slow speed?

A. I couldn't tell how fast it was going when it come around the bend. It started slowing as it come around the bend.

Q. You have never measured the distance up to the bend, have you?

A. No, sir."

Further, from the record:

"Q. Did you see the train when it came around the bend as you were sitting on the track?

A. No. I was trying to start my car and heard the noise as the train started around the bend. I looked and saw it as it started around the bend.

Q. At that time when the train first came into sight, was it putting on its brake at that time?

A. Yes.

Q. In other words, as soon as he saw you he started putting on brakes. Is that what it amounted to?

A. Yes.

Q. Did you think the train was going to get stopped before it hit you?

A. Yes.

Q. I gather it slowed down to the point it was barely moving when it came in contact with your car?

A. Yes.

Q. Could you hear the brakes squeaking and squealing or however you want to describe it?

A. Yes.

Q. Did they squeal all the time from the time you first saw it—could you hear that?

A. Just as it came around the bend it started applying his brakes.

Q. It kept slowing down as it got closer and kept getting slower and slower?

A. Yes.

Q. Did I understand you to say after you saw or heard the train coming around the bend you tried to start your car some more after that?

A. Yes.

Q. You know about how many times you tried to start it?

A. Two or three times."

Thus, Mrs. Hughes stated that the train started braking as it came around the bend (when she first could have been observed) that it was traveling slowly; that the brakes were squealing the entire time from when first applied until the car was struck, and that it (train) was barely moving when contact was made. Appellee, Paul Hughes, was not looking and did not even know a train was approaching until his sister-in-law hollered "jump". We think the evidence herein set out clearly shows that there was no justification for the submission of the issue of whether a proper lookout was being maintained.

It is next asserted that the court erred in giving AMI 305-A instead of following the "Note On Use", and giving AMI 305-B. 305-A, given, states "It was the duty of the railroad company, its agents, servants and employees, before and at the time of the occurrence, to use ordinary care for the safety of Paul Hughes". Appellants contend that B should have been given instead of A, 305-B reading as follows. "It was the duty of all persons involved in the occurrence to use ordinary care for their own safety and the safety of others."

We think appellants are correct in this contention. Several specific objections were made to the giving of 305-A, but it is sufficient to point out that the Note On Use states that A should be used when negligence on the part of the plaintiff is not an issue, and that B should be used when negligence on the part of the plaintiff is an issue. The negligence of Paul Hughes was an issue in this case, and in fact AMI 2109, instructing on comparative negligence, was given by the court at the request of appellants. The court gave no reason for using 305-A instead of 305-B, and we hold that error was committed.

Finally, it is asserted that the trial court erred in giving the jury a modified form of AMI 502, this modification consisting of adding a sentence to the instruction. AMI 502 reads as follows:

"When the negligent acts or omissions of two or more persons work together as the proximate cause of damage to another, each of those persons may be found liable. This is true regardless of the relative degree of fault between them. If you find that negligence chargeable to the defendant railroad proximately caused damage to Paul Hughes, it is not a defense that some third person may also have been to blame."

The court then added to this instruction the following sentence, "However, in this case you are told that the negligence of Thelma Hughes, if any, cannot be chargeable to Paul Hughes". We agree with appellant that this addition should not have been made, and is a clear violation of the *per curiam* order of this court

dated April 19, 1965, wherein we stated that if AMI contains an applicable instruction it should be used "unless the trial judge finds that it does not accurately state the law". The order then provides that the court shall state its reasons for refusing the AMI instruction. No reason was given by the court for adding the last sentence, and in addition to what has already been said, we think appellants are correct in stating that the addition was to the advantage of appellee. The word "However", according to Webster's Third New International Dictionary (Unabridged), means *inter alia,* "nevertheless, notwithstanding". In other words, it seems to qualify, or limit, the first part of the instruction, and to overly emphasize that the possible negligence of Thelma Hughes cannot be chargeable to Paul Hughes. Actually, of course, the additional sentence does not really add anything to the meaning of the instruction, for AMI 502 very definitely states that *if negligence of the railroad proximately caused appellee's damages it is not a defense that some third person may also have been to blame.* This "third person" can only have reference to Thelma Hughes, the driver of the automobile. The effect of the addition was simply to tell the jury twice that any negligence on her part could not be charged to appellee.

For the reasons stated herein, the judgment of the Hot Spring County Circuit Court is reversed, and the cause remanded.

It is so ordered.